**BURSOR & FISHER, P.A.**
L. Timothy Fisher (State Bar No. 191626)
Jenna L. Gavenman (State Bar No. 348510)
1990 North California Blvd., Suite 940
Walnut Creek, CA 94596
Telephone: (925) 300-4455
Facsimile:  (925) 407-2700
E-mail: ltfisher@bursor.com
          jgavenman@bursor.com

*Attorneys for Plaintiff*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CHRISTINA NOORI, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>KINDERFARMS LLC,<br><br>Defendant. | Case No.<br><br>**CLASS ACTION COMPLAINT**<br><br><u>JURY TRIAL DEMANDED</u> |

Plaintiff Christina Noori ("Plaintiff"), individually and on behalf of all others similarly situated, brings this action against Defendant KinderFarms, LLC ("KinderFarms," or "Defendant"). Plaintiff makes the following allegations pursuant to the investigation of her counsel and based upon information and belief, except as to the allegations specifically pertaining to herself, which are based on personal knowledge.

<u>**NATURE OF THE ACTION**</u>

1.     To capitalize on consumer demand for "non-toxic" medications, Defendant makes false and misleading "non-toxic" claims about its KinderMed (pronounced "kind-er-med") children's medicine product line to sell KinderFarms products at a premium price.  Even though Defendant knows that the ingredients in KinderMed products are in fact toxic, Defendant continues to make "non-toxic" misrepresentations because Defendant also knows that consumers choose KinderMed over other products based on "non-toxic" labeling statements.

2.     To differentiate KinderMed products from other children's medicine products, Defendant makes false and misleading "non-toxic" representations (the "Toxicity Representations") on the KinderMed Kids' products, including "Pain & Fever," "Cough & Congestion," and "Nighttime Cold & Cough" over the counter ("OTC") medicines (collectively, the "Products").  The Products each contain either Acetaminophen, Dextromethorphan, or Diphenhydramine (collectively, the "Toxic Ingredients"), which are all inherently toxic substances.

3.     Based on Defendant's false and misleading "non-toxic" claims, Plaintiff Christina Noori and the class members she seeks to represent, bought KinderMed Products at a premium price.  Because Plaintiff and others like her were taken in by Defendant's false "non-toxic" promises, Plaintiff brings this class action against Defendant to seek a reimbursement of the premium Plaintiff and the class members paid based on Defendant's misrepresentations.

4.     As a direct and proximate result of Defendant's false and misleading advertising claims and marketing practices, Plaintiff and the members of the Classes, as defined herein, purchased KinderMed Products.  Plaintiff and members of the Classes purchased KinderMed Products because they were deceived into believing that KinderMed Products did not contain toxic ingredients.  As a result, Plaintiff and members of the Classes purchased KinderMed Products and

have been injured in fact because KinderMed Products contain ingredients that are toxic.  Plaintiff and Class Members purchased medicine designed, marketed, distributed, and sold by Defendant as "non-toxic."  Further, Plaintiff and Class Members relied to their detriment on Defendant's representation that the Products are "non-toxic."  Plaintiff and Class Members would not have paid to purchase Defendant's Products – or would not have paid as much as they did to purchase them – had they known that they are not, in fact, "non-toxic."  Plaintiff and Class Members thus suffered monetary damages as a result of Defendant's deceptive and false representations.

5.     Plaintiff seeks relief in this action individually and on behalf of those similarly situated, and seeks to represent a National Class and a California Subclass (defined *infra*).  Plaintiff seeks injunctive relief to stop Defendant's unlawful labeling and advertising of the Products.  In addition, Plaintiff seeks damages, interest thereon, reasonable attorneys' fees and costs, other equitable relief, and disgorgement of all benefits, permissible under the law, that Defendant has enjoyed from its conduct.

6.     Plaintiff also seeks relief in this action individually and on behalf of purchasers of the KinderMed Products in California for violation of Civil Code §§ 1750, *et seq.*, the California Consumer Legal Remedies Act ("CLRA"), Bus & Prof. Code §§ 17200, *et seq.*, California's Unfair Competition Law ("UCL"), and Bus. & Prof. Code §§ 17500, *et seq.*, California's False Advertising Law ("FAL").

## PARTIES

7.     Plaintiff Christina Noori is a citizen of California, residing in San Leandro, California.  In or around November 2022, Plaintiff Noori purchased KinderMed Kids' Pain & Fever (the "Product") for her personal use in the home for approximately $6.99 from a brick and mortar Walgreens store in San Leandro, California.  Prior to her purchase of the Product, Plaintiff Noori reviewed the product's labeling and packaging and saw that the Product was purportedly "non-toxic" on the side panel.  Plaintiff Noori relied on that representation to choose her medication over comparable products.  Plaintiff Noori saw these representations prior to, and at the time of purchase, and understood them as representations and warranties that her Product was "non-toxic."  Plaintiff did not realize that the Product included active ingredients inconsistent with

that representation.  Plaintiff Noori relied on the representations and warranties that her Product was "non-toxic" in deciding to purchase her Product.  Accordingly, these representations and warranties were part of the basis of the bargain, in that she would not have purchased the Product on the same terms had she known these representations were not true.  However, Plaintiff Noori remains interested in purchasing non-toxic children's medications and would consider KinderMed in the future if Defendant ensured the Products were actually non-toxic.  In making her purchase, Plaintiff Noori paid a substantial price premium due to the false and misleading Toxicity Representations.  However, Plaintiff Noori did not receive the benefit of her bargain because her Product, in fact, was toxic.  Plaintiff Noori further understood that the purchase came with Defendant's representation and warranties that her Product was "non-toxic."

8.    Defendant KinderFarms, LLC is a limited liability company organized and existing under the laws of the state of Delaware, with its principal place of business in Redondo Beach, California.  KinderFarms manufactures, sells, and/or distributes KinderMed-branded products, and is responsible for the advertising, marketing, trade dress, and packaging of the Products. KinderFarms manufactured, marketed, and sold the Products during the class period.  The planning and execution of the advertising, marketing, labeling, packaging, testing, and corporate operations concerning the Products and the Toxicity Representations was primarily carried out at KinderFarms' headquarters and facilities within California.  The policies, practices, acts, and omissions giving rise to this action were developed in, and emanated from, KinderFarms' headquarters in Redondo Beach, California.

## JURISDICTION AND VENUE

9.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(d)(2)(a) because there are more than 100 Class Members, the aggregate amount in controversy exceeds $5,000,000.00, exclusive of interest, fees, and costs, and at least one Class member is a citizen of a state different from at least one Defendant.

10.    This Court has personal jurisdiction over Defendant because it conducts substantial business within California, including the manufacturing, sale, marketing, and advertising of the Products.  Defendant also maintains its headquarters and principal place of business in this State.

Furthermore, a substantial portion of the events giving rise to Plaintiff Noori's claims occurred in this State, including Plaintiff Noori's purchase of her Product.

11.     Venue is proper in this District under 28 U.S.C. § 1391 because a substantial part of the events and omissions giving rise to Plaintiff's claims occurred in this District.  In addition, Plaintiff purchased the unlawful Products in this District, and Defendant has marketed, advertised, and sold the Products within this District.

## FACTUAL BACKGROUND

### A.     Background On The "Clean" Medication Industry

12.     In recent years, consumers have become progressively more aware and apprehensive about unnecessary and harmful extra ingredients in OTC medications that remedy and reduce common ailments, including coughs, congestion, and fevers.  The most common OTC medications manufactured and sold by conventional pharmaceutical companies such as Pfizer, Procter & Gamble, or Johnson & Johnson have effective active ingredients, but also contain as inactive ingredients many artificial substances including dyes, preservatives, sweeteners, common allergens, and other synthetic fillers (*e.g.*, FD&C red dye no. 40, sucralose and titanium dioxide), including ingredients banned or requiring warning labels in other countries.  Indeed, a study found that 75% of common pills are filled with these inactive ingredients.[1]

13.     While these miniscule amounts are unlikely to affect most people, unnecessary inactive ingredients can cause allergic or adverse reactions.[2]  Researchers have discovered that "at least 55% of drugs contained at least one hard-to-digest sugar linked to gas, bloating, abdominal pain, diarrhea, and constipation.[3]  These adverse and problematic effects, as caused by the inactive ingredients, are as unnecessary as the inactive ingredients themselves.

---

[1] *See* Rina Raphael, "Are 'clean meds' the next big wellness frontier?" https://www.fastcompany.com/90330368/are-clean-meds-the-next-big-wellness-frontier (April 5, 2019).

[2] *Id.*

[3] *Id.*

14.     As a result, consumers concerned about these inactive ingredients are increasingly seeking clean alternatives to the big brand-name OTC medications—medications that do not include the unnecessary inactive ingredients.

15.     In response to consumers' desire for safe and "clean" OTC medications, some companies, including Defendant, "greenwash" their products by deceptively claiming that their medications are safe.  Unfortunately, rather than acknowledging that a certain amount of toxicity is present when active ingredients such as acetaminophen, dextromethorphan, or diphenhydramine are in the medications, companies, like Defendant, have chosen instead to "greenwash" their products through deceptive labeling, suggesting and outright stating that their medications are safe and non-toxic when, in fact, they can cause harm to humans.

16.     Recognizing this problem, the United States Federal Trade Commission ("FTC") created the "Green Guides" to help companies avoid making misleading and deceptive claims.[4] The Green Guides specifically address the use of the term "non-toxic" in the marketing of a product, stating, "A non-toxic claim likely conveys that a product, package, or service is non-toxic both for humans and for the environment generally."[5]  Accordingly, "[i]t is deceptive to misrepresent, directly or by implication, that a product, package, or service is non-toxic.  Non-toxic claims should be clearly and prominently qualified to the extent necessary to avoid deception."[6]

17.     Indeed, in commenting on the Green Guides, the Environmental Protection Agency ("EPA") "**believes that marketers will 'rarely, if ever, be able to adequately qualify and substantiate such a claim of 'non-toxic' in a manner that will be clearly understood by consumers**.'"[7]  The EPA further explained:

> [A] "non-toxic" claim conveys that a product is non-toxic for both humans and for the environment generally.  Demonstrating a lack of toxicity in a generic sense involves testing for a broad array of endpoints (e.g., acute toxicity, carcinogenicity and other chronic effects, developmental and reproductive toxicity, neurotoxicity,

---

[4] *See generally* 16 C.F.R. § 260 – Guides for the Use of Environmental Marketing Claims.

[5] 16 C.F.R. § 260.10(b).

[6] 16 C.F.R. § 260.10(a).

[7] EPA Comments on Proposed Revisions to Green Guides (2010), https://www.ftc.gov/sites/default/files/documents/public_comments/guides-use-environmental-marketing-claims-project-no.p954501-00288%C2%A0/00288-57070.pdf.

sensitization, etc.) across a variety of species.  It is highly unlikely that the typical consumer product will have been subjected to this degree of testing with a resulting finding of "no adverse effect" for each of the endpoints evaluated.[8]

18.    "According to the EPA, this inference might prevent consumers from taking necessary precautions in handling a product."[9]

19.    The Green Guides also provide examples of marketing claims to "provide the Commission's views on how **reasonable consumers** likely interpret certain claims."[10]  The FTC provided the following relevant example:[11]

> A marketer advertises a cleaning product as "essentially non-toxic" and "practically non-toxic.  **The advertisement likely conveys that the product does not pose any risk to humans** or the environment, including household pets.

20.    This example demonstrates that even when "non-toxic" claims are qualified by such terms as "essentially" or "practically," they are nonetheless construed by reasonable consumers as "not pos[ing] any risk to humans."  Thus, broad and unqualified non-toxic claims, such as the Toxicity Representations present on the Products, would even more strongly convey the meaning that the Products do not pose any risk of harm to humans.

**B.    The KinderFarms Products And Representations At Issue**

21.    As described *supra*, Defendant manufactures, markets, advertises, labels, and sells "non-toxic" KinderMed Kids' Products, including "Pain & Fever," "Cough & Congestion," and "Nighttime Cold & Cough" OTC medicines.

22.    True and correct images of the Products and Toxicity Representations are as follows (red boxes added to highlight relevant text):

---

[8] *Id.  See also* Fed. Trade Comm'n, The Green Guide Statement and Business Purpose (2012), https://www.ftc.gov/sites/default/files/attachments/press-releases/ftc-issues-revised-green-guides/greenguidesstatement.pdf ("Similarly, [Consumers Union] suggested that because 'non-toxic' claims are so difficult to substantiate and for consumers to verify, the marketplace would be better served with 'specific claims of how a product contains less toxic or no toxic materials rather than using a 'non-toxic' claim.'").

[9] *Id.*

[10] 16 C.F.R. § 260.1(d).

[11] 16 C.F.R. § 260.10.

1

**KinderMed Kids' Pain & Fever**



2
3
4
5
6
7
8
9
10
11
12
13
14

15

**KinderMed Kids' Cough & Congestion**



16
17
18
19
20
21
22
23
24
25
26
27
28

**KinderMed Kids' Nighttime Cold & Cough**



23.     Each of the Products prominently displays Defendant's "Promise," signed by famous actress Jessica Biel, declaring these medications "non-toxic."  In addition to the representations on the boxes of each Product, Ms. Biel commercially promotes KinderMed Products on social media and other platforms, including appearances on national television.

**C.     Defendant's "Non-Toxic" Marketing Scheme Is False And Misleading**

24.     As demonstrated *supra*, the majority of KinderMed Products prominently display the "OUR PROMISE" box containing the Toxicity Representations ("non-toxic health products") at issue.  Defendant's statement that it makes "non-toxic" health products (outlined in red in the above Product images for ease of reference) – is false and misleading.  Defendant repeats these false statements in materially identical form on its website.[12]

25.     In fact, KinderFarms' KinderMed Products are *not* "non-toxic" health products. KinderMed's "Kids' Pain & Fever" products contain acetaminophen.  It is the sole active ingredient found in KinderMed's Kids' Pain & Fever products.  When used properly and in accordance with the recommended daily dosage, acetaminophen is an effective pain-relieving and

---

[12] *See e.g.*, https://kinderfarms.com/products/kindermed-kids-pain-fever.

fever-reducing agent.  But its potential potency cannot be taken lightly, nor can it accurately be described as "non-toxic."

26.    There is a consensus in the medical community, also reflected in guidance by the federal Food and Drug Administration ("FDA"), that acetaminophen is a toxic substance.  Although many perceive that acetaminophen is safe and can be taken with impunity, the truth, however, is that acetaminophen is toxic when taken in excess both acutely and chronically.  Acetaminophen toxicity is a common cause of acute liver failure in children and adolescents.[13]  It has the potential to cause serious liver damage if more than directed is used.[14]  And, an acetaminophen overdose can be fatal.

27.    Defendant's Toxicity Representations on its Products are contrary to the widespread expert consensus that acetaminophen carries toxicity potential, as reflected in FDA information and guidance from health professionals, making KinderFarms' "Promise" objectively false and misleading.

28.    An average consumer does not carefully read the fine print containing FDA warnings with a variety of nuances about the active ingredient(s).  In one particular study, only 26% of those surveyed indicated that they bothered to read the active ingredients on the OTC label.[15]  Similarly, another study indicated that only 42% of subjects said they read everything on the label when taking an OTC medication for the first time.[16]  Further, studies also suggest that consumers spend less time viewing warnings compared to other aspects of package labeling (*e.g.*,

---

[13] *See* UPMC Children's Hospital of Pittsburgh, "Acetaminophen Toxicity Symptoms and Treatment," https://www.chp.edu/our-services/transplant/liver/education/liver-disease-states/acetaminophen-toxicity#:~:text=The%20maximum%20recommended%20acetaminophen%20dosage,chemicals)%20with%20use%20of%20acetaminophen.

[14] *See* Cleveland Clinic, "Acetaminophen Toxicity in Children and Adolescents," https://my.clevelandclinic.org/health/articles/21188-acetaminophen-toxicity-in-children-and-adolescents.

[15] *See* The People's Pharmacy, "Do You Read OTC Medication Labels?  You Should!" https://www.peoplespharmacy.com/articles/do-you-read-otc-medication-labels-you-should.

[16] Jesse R. Catlin and Eric P. Brass, "The Effectiveness of Nonprescription Drug Labels in the United States: Insights from Recent Research and Opportunities for the Future," https://www.ncbi.nlm.nih.gov/pmc/articles/PMC6306891/#:~:text=Unfortunately%2C%20multiple%20studies%20suggest%20that,relievers%20before%20use%20%5B3%5D. (2018).

the brand name).[17]  An average consumer is more likely to credit the simple, declarative, and unconditional statement on the product he or she is considering purchasing than to parse the complex verbiage on an FDA drug label.

29.    Even for the select few customers who may read the back of the KinderMed packaging that contains various warnings, the vast majority of parents do not possess the scientific knowledge or expertise to parse through such warnings and understand how to interpret these in light of the statement on a separate side of the packaging concerning the "non-toxic" nature of the company's products.

30.    Nothing in the "non-toxic" claim language on KinderMed's packaging suggests that this language applies strictly to the non-active ingredients.  Therefore, an average consumer would likely interpret the statement to refer to all ingredients—both the active and non-active ingredients. The bottom line is, the claims about the "non-toxic" nature of KinderFarms' KinderMed products are dangerous to the consuming public and injunctive relief should issue requiring the correction of KinderMed packaging and the recall of products in the marketplace.

31.    Likewise, KinderFarms' statements that its Kids' Cough & Congestion product, which contains active ingredients Dextromethorphan HBr and Guaifenesin and Kids' Nighttime Cold & Cough product, which contains Diphenhydramine HCl and Phenylephrine HCl, are "non-toxic" are false and misleading.  Diphenhydramine, an ingredient commonly found in OTC drug products such as Benadryl, is a common cause of anticholinergic toxicity.  In September 2020, the FDA released a warning regarding the dangers of taking more than the recommended doses of Benadryl.[18]  Additionally, reports of adolescents intentionally overdosing on diphenhydramine has recently drawn national attention.[19]  Dextromethorphan poisoning can also occur.  Though these substances can be safe and effective cough suppressants, recreational and accidental abuse can, and

---

[17] Id.

[18] U.S. Food & Drug Administration, "FDA warns about serious problems with high doses of the allergy medicine diphenhydramine (Benadryl)," https://www.fda.gov/drugs/drug-safety-and-availability/fda-warns-about-serious-problems-high-doses-allergy-medicine-diphenhydramine-benadryl (2020).

[19] University of Utah Health, "Diphenhydramine Toxicity," https://poisoncontrol.utah.edu/news/2021/11/diphenhydramine-toxicity (2021).

has, occurred with dire consequences because of the inherent toxicity of these substances.[20]  Thus, again, KinderFarms' statement that these products are "non-toxic" is not only false and misleading, but dangerous to consumers.  Injunctive relief should likewise be issued, barring these statements and requiring the recall of Products already in the marketplace.

32.    Because the entire premise of "clean" medicines is to reduce synthetic, potentially harmful inactive ingredients and incorporate organic and naturally occurring ingredients, consumers electing to purchase clean medicine products care about what they and their children are ingesting and are selecting KinderMed products because of its messaging. Consumers' desire for reassurance that they will receive safe and effective medicine is illustrated by the fact that KinderFarms describes the KinderMed Kids' Pain & Fever, for example, on KinderFarms' website as "made with the same effective, active ingredient...so you can trust it to provide safe and effective relief for your child."

33.    Given the motivations and predilections of consumers seeking to purchase "clean" medicines, Defendant's misleading Toxicity Representations trick reasonable consumers into choosing its Products over comparable brands.  Indeed, consumers choosing between two "clean" medicine products, one offering the assurance that it is non-toxic and the other not making that claim, are likely to choose the former—at the expense of unwitting consumers and Defendant's lawfully acting competitors, over whom Defendant maintains an unfair competitive advantage.

34.    The Toxicity Representations were and are material to reasonable consumers, including Plaintiff, in making purchasing decisions.  Indeed, Plaintiff relied on Defendant's misrepresentations, described herein, in making the decision to purchase the Products.  At the time Plaintiff purchased the Products, Plaintiff did not know, and had no reason to know, that the Products' labeling and advertising were false, misleading, deceptive, and unlawful as set forth herein.

---

[20] Poison Control, "Dextromethorphan Abuse," https://www.poison.org/articles/dextromethorphan#:~:text=Dextromethorphan%20poisoning%20can%20also%20cause%20slow%20breathing%2C%20fast,intent%20such%20as%20insomnia%20and%20dysphoria%20%28unease%2C%20unhappiness%29.

35.    Defendant materially misled and failed to adequately inform reasonable consumers, including Plaintiff, that the Products can cause harm to humans.  Plaintiff would not have purchased the Products if she had known the truth.  Accordingly, based on Defendant's material misrepresentations and omissions, reasonable consumers, including Plaintiff, purchased the Products to their detriment.

## CLASS ACTION ALLEGATIONS

36.    **Class Definition.**  Plaintiff brings this action as a class action pursuant to Federal Rules of Civil Procedure 23(b)(2) and 23(b)(3) on behalf of herself and all others similarly situated, and as members of the Classes as defined as follows:

> All residents of the United States who, within the applicable statute of limitations periods, purchased the Products for purposes other than resale ("**Nationwide Class**"); and

> All residents of California who, within four years prior to the filing of this Complaint, purchased the Products for purposes other than resale ("**California Subclass**").

("Nationwide Class" and "California Subclass," collectively, "**Class**").

37.    **Class Definition Exclusions.**  Excluded from the Class are: (i) Defendant, its assigns, successors, and legal representatives; (ii) any entities in which Defendant has controlling interests; (iii) federal, state, and/or local governments, including, but not limited to, their departments, agencies, divisions, bureaus, boards, sections, groups, counsels, and/or subdivisions; and (iv) any judicial officer presiding over this matter and person within the third degree of consanguinity to such judicial officer.

38.    **Reservation of Rights to Amend the Class Definition.**  Plaintiff reserves the right to amend or otherwise alter the class definition presented to the Court at the appropriate time in response to facts learned through discovery, legal arguments advanced by Defendant, or otherwise.

39.    **Numerosity:**  Members of the Class are so numerous that joinder of all members is impracticable.  Upon information and belief, the Nationwide Class consists of tens of thousands of purchasers (if not more) dispersed throughout the United States, and the California Subclass likewise consists of thousands of purchasers (if not more) dispersed throughout the State of

California.  Accordingly, it would be impracticable to join all members of the Class before the Court.

40.    **Common Questions Predominate:** There are numerous and substantial questions of law or fact common to all members of the Class that predominate over any individual issues. Included within the common questions of law or fact are:

a.    Whether Defendant engaged in unlawful, unfair or deceptive business practices by advertising and selling the Products.

b.    Whether Defendant's conduct of advertising and selling the Products as containing only "non-toxic" ingredients when they do not constitutes an unfair method of competition, or unfair or deceptive act or practice, in violation of Civil Code section 1750, *et seq.*:

c.    Whether Defendant used deceptive representations in connection with the sale of the Products in violation of Civil Code section 1750, *et seq.*;

d.    Whether Defendant represented that the Products have characteristics or quantities that they do not have in violation of Civil Code section 1750, *et seq.*;

e.    Whether Defendant advertised the Products with intent not to sell them as advertised in violation of Civil Code section 1750, *et seq.*;

f.    Whether Defendant's labeling and advertising of the Products are untrue or misleading in violation of Business and Professions Code section 17500, *et seq.*;

g.    Whether Defendant knew or by the exercise of reasonable care should have known its labeling and advertising was and is untrue or misleading in violation of Business and Professions Code section 17500, *et seq.*;

h.    Whether Defendant's conduct is an unfair business practice within the meaning of Business and Professions Code section 17200, *et seq.*;

i.    Whether Defendant's conduct is a fraudulent business practice within the meaning of Business and Professions Code section 17200, *et seq.*;

j.    Whether Defendant's conduct is an unlawful business practice within the meaning of Business and Professions Code section 17200, *et seq.*;

k.    Whether Plaintiff and the Class paid more money for the Products than they actually received;

l.    How much more money Plaintiff and the Class paid for the Products than they actually received;

m.    Whether Defendant's conduct constitutes breach of warranty;

n.    Whether Plaintiff and the Class are entitled to injunctive relief; and

o.    Whether Defendant was unjustly enriched by its unlawful conduct.

41. **Typicality:** Plaintiff's claims are typical of the claims of the Class Members she seeks to represent because Plaintiff, like the Class Members, purchased Defendant's misleading and deceptive Products. Defendant's unlawful, unfair and/or fraudulent actions concern the same business practices described herein irrespective of where they occurred or were experienced. Plaintiff and the Class sustained similar injuries arising out of Defendant's conduct. Plaintiff's and Class Members' claims arise from the same practices and course of conduct and are based on the same legal theories.

42. **Adequacy:** Plaintiff is an adequate representative of the Class she seeks to represent because her interests do not conflict with the interests of the Class Members Plaintiff seeks to represent. Plaintiff will fairly and adequately protect Class Members' interests and has retained counsel experienced and competent in the prosecution of complex class actions, including complex questions that arise in consumer protection litigation.

43. **Superiority and Substantial Benefit:** A class action is superior to other methods for the fair and efficient adjudication of this controversy, since individual joinder of all members of the Class is impracticable and no other group method of adjudication of all claims asserted herein is more efficient and manageable for at least the following reasons:

   a. The claims presented in this case predominate over any questions of law or fact, if any exist at all, affecting any individual member of the Class;

   b. Absent a Class, the members of the Class will continue to suffer damage and Defendant's unlawful conduct will continue without remedy while Defendant profits from and enjoys its ill-gotten gains;

   c. Given the size of individual Class Members' claims, few, if any, Class Members could afford to or would seek legal redress individually for the wrongs Defendant committed against them, and absent Class Members have no substantial interest in individually controlling the prosecution of individual actions;

   d. When the liability of Defendant has been adjudicated, claims of all members of the Class can be administered efficiently and/or determined uniformly by the Court; and

   e. This action presents no difficulty that would impede its management by the Court as a class action, which is the best available means by which Plaintiff and Class Members can seek redress for the harm caused to them by Defendant.

44. **Inconsistent Rulings.** Because Plaintiff seeks relief for all members of the Class, the prosecution of separate actions by individual members would create a risk of inconsistent or

varying adjudications with respect to individual members of the Class, which would establish incompatible standards of conduct for Defendant.

45. **Injunctive/Equitable Relief.**  The prerequisites to maintaining a class action for injunctive or equitable relief pursuant to Fed. R. Civ. P. 23(b)(2) are met as Defendant has acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive or equitable relief with respect to the Class as a whole.

46. **Manageability.**  Plaintiff and Plaintiff's counsel are unaware of any difficulties that are likely to be encountered in the management of this action that would preclude its maintenance as a class action.

**COUNT ONE**
**Violation of California Unfair Competition Law**
**(Cal. Bus. & Prof. Code §§ 17200, *et seq.*)**
**(*On Behalf of the Nationwide Class and California Subclass*)**

47. **Incorporation by Reference.**  Plaintiff re-alleges and incorporates by reference all allegations contained in this complaint, as though fully set forth herein.

48. **Nationwide Class & California Subclass.**  This cause of action is brought pursuant to Business and Professions Code Section 17200, *et seq.*, on behalf of Plaintiff, the Nationwide Class, and the California Subclass (the Class) who purchased the Products within the applicable statute of limitations.

49. **The UCL.**  California Business & Professions Code, sections 17200, *et seq.* (the **"UCL"**) prohibits unfair competition and provides, in pertinent part, that "unfair competition shall mean and include unlawful, unfair or fraudulent business practices and unfair, deceptive, untrue or misleading advertising."

50. **False Advertising Claims.**  Defendant, in its advertising and packaging of the Products, made false and misleading statements and fraudulent omissions regarding the quality and characteristics of the Products—specifically, the "non-toxic" representation—despite the fact the Products contain ingredients that are toxic.  Such claims and omissions appear on the label and packaging of the Products, which are sold at retail stores and point-of-purchase displays.

51.     **Defendant's Deliberately False and Fraudulent Marketing Scheme.**  Defendant does not have any reasonable basis for the claims about the Products made in Defendant's advertising and on Defendant's packaging or labeling because the Products contain ingredients that are toxic.  Defendant knew and knows that the Products are not truly non-toxic medications, though Defendant intentionally advertised and marketed the Products to deceive reasonable consumers into believing that Products contain only non-toxic ingredients.

52.     **False Advertising Claims Cause Purchase of Products.**  Defendant's labeling and advertising of the Products led to, and continues to lead to, reasonable consumers, including Plaintiff, believing that the Products are truly non-toxic and thus safer than similar medications.

53.     **Injury in Fact.**  Plaintiff and the Class have suffered injury in fact and have lost money or property as a result of and in reliance upon Defendant's False Advertising Claims—namely Plaintiff and the Class lost the purchase price for the Products they bought from the Defendant.

54.     **Conduct Violates the UCL.**  Defendant's conduct, as alleged herein, constitutes unfair, unlawful, and fraudulent business practices pursuant to the UCL.  The UCL prohibits unfair competition and provides, in pertinent part, that "unfair competition shall mean and include unlawful, unfair or fraudulent business practices and unfair, deceptive, untrue or misleading advertising."  Cal. Bus & Prof. Code § 17200.  In addition, Defendant's use of various forms of advertising media to advertise, call attention to, or give publicity to the sale of goods or merchandise that are not as represented in any manner constitutes unfair competition, unfair, deceptive, untrue or misleading advertising, and an unlawful business practice within the meaning of Business and Professions Code Sections 17200 and 17531, which advertisements have deceived and are likely to deceive the consuming public, in violation of Business and Professions Code Section 17200.

55.     **No Reasonably Available Alternatives/Legitimate Business Interests.**  Defendant failed to avail itself of reasonably available, lawful alternatives to further its legitimate business interests.

56.     **Business Practice.**  All of the conduct alleged herein occurred and continues to occur in Defendant's business.  Defendant's wrongful conduct is part of a pattern, practice and/or generalized course of conduct, which will continue on a daily basis until Defendant voluntarily alters its conduct or Defendant is otherwise ordered to do so.

57.     **Injunction.**  Pursuant to Business and Professions Code Sections 17203 and 17535, Plaintiff and Class Members seek an order of this Court enjoining Defendant from continuing to engage, use, or employ its practice of labeling and advertising the sale and use of the Products. Likewise, Plaintiff and Class Members seek an order requiring Defendant to disclose such misrepresentations, and to preclude Defendant's failure to disclose the existence and significance of said misrepresentations.

58.     **Causation/Remedies.**  As a direct and proximate result of Defendant's misconduct in violation of the UCL, Plaintiff and Class Members were harmed in the amount of the purchase price they paid for the Products.  Further, Plaintiff and Class Members have suffered and continue to suffer economic losses including, but not limited to, the amounts paid for the Products, and any interest that would have accrued on those monies, in an amount to be proven at trial.  Accordingly, Plaintiff seeks a monetary award for violation of the UCL in restitution and/or disgorgement of ill-gotten gains to compensate Plaintiff and the Class for said monies, as well as injunctive relief to enjoin Defendant's misconduct to prevent ongoing and future harm that will result.

### A.     "Unfair" Prong

59.     **Unfair Standard.**  Under the UCL, a challenged activity is "unfair" when "any injury it causes outweighs any benefits provided to consumers and the injury is one that the consumers themselves could not reasonably avoid." *Camacho v. Auto Club of Southern California,* 142 Cal. App. 4th 1394, 1403 (2006).

60.     **Injury.**  Defendant's action of mislabeling the Products with the Toxicity Representations does not confer any benefit to consumers; rather, doing so causes injuries to consumers, who do not receive products commensurate with their reasonable expectations, overpay for the Products, and receive Products of lesser standards than what they reasonably expected to receive.  Consumers cannot avoid any of the injuries caused by Defendant's deceptive labeling and

advertising of the Products.  Accordingly, the injuries caused by Defendant's deceptive labeling and advertising outweigh any benefits.

61.  **Balancing Test.**  Some courts conduct a balancing test to decide if a challenged activity amounts to unfair conduct under California Business and Professions Code Section 17200. They "weigh the utility of the defendant's conduct against the gravity of the harm to the alleged victim." *Davis v. HSBC Bank Nevada, N.A.,* 691 F.3d 1152, 1169 (9th Cir. 2012).

62.  **No Utility.**  Here, Defendant's conduct of labeling the Products with the Toxicity Representations when the Products contain toxic active ingredients that are dangerous has no utility and financially harms purchasers.  Thus, the utility of Defendant's conduct is vastly outweighed by the gravity of harm.

63.  **Legislative Declared Policy.**  Some courts require that "unfairness must be tethered to some legislative declared policy or proof of some actual or threatened impact on competition." *Lozano v. AT&T Wireless Servs. Inc.,* 504 F. 3d 718, 735 (9th Cir. 2007).

64.  **Unfair Conduct.**  Defendant's labeling and advertising of the Products, as alleged herein, is false, deceptive, misleading, and unreasonable, and constitutes unfair conduct. Defendant knew or should have known of its unfair conduct.  Defendant's misrepresentations constitute an unfair business practice within the meaning of California Business and Professions Code Section 17200.

65.  **Reasonably Available Alternatives.**  There existed reasonably available alternatives to further Defendant's legitimate business interests, other than the conduct described herein.  Defendant could have refrained from labeling the Products with the Toxicity Representations.

66.  **Defendant's Wrongful Conduct.**  All of the conduct alleged herein occurs and continues to occur in Defendant's business.  Defendant's wrongful conduct is part of a pattern or generalized course of conduct repeated on thousands of occasions daily.

67.  **Injunction.**  Pursuant to Business and Professions Code Sections 17203, Plaintiff and the Class seek an order of this Court enjoining Defendant from continuing to engage, use, or employ its practices of labeling the Products with the Toxicity Representations.

68. **Causation/Remedies.**  Plaintiff and the Class have suffered injury in fact and have lost money as a result of Defendant's unfair conduct.  Plaintiff and the Class paid an unwarranted premium for these Products.  Specifically, Plaintiff and Class Members paid for Products that contain toxic active ingredients.  Plaintiff and the Class would not have purchased the Products, or would have paid substantially less for the Products, if they had known that the Products' advertising and labeling were deceptive.  Accordingly, Plaintiff seeks a monetary award for violation of the UCL in restitution and/or disgorgement of ill-gotten gains to compensate Plaintiff and the Class for said monies, as well as injunctive relief to enjoin Defendant's misconduct to prevent ongoing and future harm that will result.

**B.     "Fraudulent" Prong**

69. **Fraud Standard.**  The UCL considers conduct fraudulent (and prohibits said conduct) if it is likely to deceive members of the public.  *Bank of the West v. Superior Court*, 2 Cal. 4th 1254, 1267 (1992).

70. **Fraudulent & Material Challenged Representation.**  Defendant used the Toxicity Representations with the intent to sell the Products to consumers, including Plaintiff and the Class. The Toxicity Representations are false, and Defendant knew or should have known of their falsity. The Toxicity Representations are likely to deceive consumers into purchasing the Products because they are material to the average, ordinary, and reasonable consumer.

71. **Fraudulent Business Practice.**  As alleged herein, the misrepresentations by Defendant constitute a fraudulent business practice in violation of California Business & Professions Code Section 17200.

72. **Reasonable and Detrimental Reliance.**  Plaintiff and Class Members reasonably and detrimentally relied on the material and false Toxicity Representations to their detriment in that they purchased the Products.

73. **Reasonably Available Alternatives.**  Defendant had reasonably available alternatives to further its legitimate business interests, other than the conduct described herein. Defendant could have refrained from labeling the Products with the Toxicity Representations.

74.    **Business Practice.**  All of the conduct alleged herein occurs and continues to occur in Defendant's business.  Defendant's wrongful conduct is part of a pattern or generalized course of conduct.

75.    **Injunction.**  Pursuant to Business and Professions Code Sections 17203, Plaintiff and the Class seek an order of this Court enjoining Defendant from continuing to engage, use, or employ its practice of labeling the Products with the Toxicity Representations.

76.    **Causation/Remedies.**  Plaintiff and the Class have suffered injury in fact and have lost money as a result of Defendant's fraudulent conduct.  Plaintiff paid an unwarranted premium for the Products.  Specifically, Plaintiff and Class Members paid for products that they believed contained only non-toxic ingredients, when, in fact, the Products contained toxic ingredients.  Plaintiff and the Class would not have purchased the Products if they had known the truth.  Accordingly, Plaintiff seeks a monetary award for violation of the UCL in restitution and/or disgorgement of ill-gotten gains to compensate Plaintiff and the Class for said monies, as well as injunctive relief to enjoin Defendant's misconduct to prevent ongoing and future harm that will result.

### C.    "Unlawful" Prong

77.    **Unlawful Standard.**  The UCL identifies violations of other laws as "unlawful practices that the unfair competition law makes independently actionable."  *Velazquez v. GMAC Mortg. Corp.,* 605 F. Supp. 2d 1049, 1068 (C.D. Cal. 2008).

78.    **Violations of CLRA and FAL.**  Defendant's labeling of the Products, as alleged herein, violates California Civil Code sections 1750, *et seq.* (the "**CLRA**") and California Business and Professions Code sections 17500, *et seq.* (the "**FAL**") as set forth below in the sections regarding those causes of action.

79.    **Additional Violations.**  Defendant's conduct in making the false representations described herein constitutes a knowing failure to adopt policies in accordance with and/or adherence to applicable laws, as set forth herein, all of which are binding upon and burdensome to their competitors.  This conduct engenders an unfair competitive advantage for Defendant, thereby constituting an unfair, fraudulent and/or unlawful business practice under California Business &

Professions Code sections 17200-17208.  Additionally, Defendant's misrepresentations of material facts, as set forth herein, violate California Civil Code sections 1572, 1573, 1709, 1710, 1711, and 1770, as well as the common law.

80.    **Unlawful Conduct.**  Defendant's packaging, labeling, and advertising of the Products, as alleged herein, are false, deceptive, misleading, and unreasonable, and constitute unlawful conduct.  Defendant knew or should have known of its unlawful conduct.

81.    **Reasonably Available Alternatives.**  Defendant had reasonably available alternatives to further its legitimate business interests, other than the conduct described herein. Defendant could have refrained from labeling the Products with the Toxicity Representations.

82.    **Business Practice.**  All of the conduct alleged herein occurs and continues to occur in Defendant's business.  Defendant's wrongful conduct is part of a pattern or generalized course of conduct.

83.    **Injunction.**  Pursuant to Business and Professions Code Section 17203, Plaintiff and the Class seek an order of this Court enjoining Defendant from continuing to engage, use, or employ its practice of false and deceptive advertising of the Products.

84.    **Plaintiff and The Class Lack an Adequate Remedy at Law.**  Plaintiff and Class Members have suffered an injury in fact resulting in the loss of money and/or property as a proximate result of the violations of law and wrongful conduct of Defendant alleged herein, and they lack an adequate remedy at law to address the unfair conduct at issue here.  Legal remedies available to Plaintiff and Class Members are inadequate because they are not equally prompt and certain and in other ways efficient as equitable relief.  Damages are not equally certain as restitution because the standard that governs restitution is different than the standard that governs damages.  Hence, the Court may award restitution even if it determines that Plaintiff fails to sufficiently adduce evidence to support an award of damages.  Damages and restitution are not the same amount.  Unlike damages, restitution is not limited to the amount of money Defendant wrongfully acquired plus the legal rate of interest.  Equitable relief, including restitution, entitles the plaintiff to recover all profits from the wrongdoing, even where the original funds taken have grown far greater than the legal rate of interest would recognize.  Legal claims for damages are not

equally certain as restitution because claims under the UCL entail few elements.  In short, significant differences in proof and certainty establish that any potential legal claim cannot serve as an adequate remedy at law.

85.    **Causation/Remedies.**  Plaintiff and the Class have suffered injury in fact and have lost money as a result of Defendant's unlawful conduct.  Plaintiff and the Class paid an unwarranted premium for the Products.  Plaintiff and Class Members would not have purchased the Products if they had known that Defendant's purposely deceived consumers into believing that the Products are truly non-toxic.  Accordingly, Plaintiff seeks a monetary award for violation of the UCL in restitution and/or disgorgement of ill-gotten gains to compensate Plaintiff and the Class for said monies, as well as injunctive relief to enjoin Defendant's misconduct to prevent ongoing and future harm that will result.

**COUNT TWO**
**Violation of California False Advertising Law**
**(Cal. Bus. & Prof. Code §§ 17500, *et seq.*)**
**(*On Behalf of the Nationwide Class and California Subclass*)**

86.    **Incorporation by reference.**  Plaintiff re-alleges and incorporates by reference all allegations contained in this complaint, as though fully set forth herein.

87.    **Nationwide Class & California Subclass.**  Plaintiff brings this claim individually and on behalf of the Nationwide Class California Subclass (the Class) who purchased the Products within the applicable statute of limitations.

88.    **FAL Standard.**  The False Advertising Law, codified at Cal. Bus. & Prof. Code section 17500, *et seq.*, prohibits "unfair, deceptive, untrue or misleading advertising[.]"

89.    **False & Material Challenged Representation Disseminated to Public.** Defendant violated section 17500 when it advertised and marketed the Products through the unfair, deceptive, untrue, and misleading Toxicity Representations disseminated to the public through the Products' labeling, packaging and advertising.  These representations were false because the Products do not conform to them.  The representations were material because they are likely to mislead a reasonable consumer into purchasing the Products.

90.     **Knowledge.**  In making and disseminating the representations alleged herein, Defendant knew or should have known that the representations were untrue or misleading, and acted in violation of § 17500.

91.     **Intent to Sell.**  Defendant's Toxicity Representations were specifically designed to induce reasonable consumers, like Plaintiff and the Class, to purchase the Products.

92.     **Plaintiff and Class Members Lack an Adequate Remedy at Law.**  As a direct and proximate result of Defendant's misleading and false advertisements, Plaintiff and the Class have suffered injury in fact and have lost money.  As such, Plaintiff requests that this Court order Defendant to restore this money to Plaintiff and Class Members, and to enjoin Defendant from continuing these unfair practices in violation of the FAL in the future.  Otherwise, Plaintiff, the Class Members, and the broader public will be irreparably harmed and/or denied an effective and complete remedy.

93.     **Causation/Remedies.**  As a direct and proximate result of Defendant's misconduct in violation of the FAL, Plaintiff and Class Members were harmed in the amount of the purchase price they paid for the Products.  Further, Plaintiff and Class Members have suffered and continue to suffer economic losses including, but not limited to, the amounts paid for the Products, and any interest that would have accrued on those monies, in an amount to be proven at trial.  Accordingly, Plaintiff seeks a monetary award for violation of the FAL in restitution and/or disgorgement of ill-gotten gains to compensate Plaintiff and the Class for said monies, as well as injunctive relief to enjoin Defendant's misconduct to prevent ongoing and future harm that will result.

**COUNT THREE**
**Violation of California Consumers Legal Remedies Act**
**(Cal. Bus. & Prof. Code §§ 1750, *et seq.*)**
**(Injunctive Relief Only)**
**(*On Behalf of the Nationwide Class and California Subclass*)**

94.     **Incorporation by Reference.**  Plaintiff re-alleges and incorporates by reference all allegations contained in this complaint, as though fully set forth herein.

95.    **Nationwide Class & California Subclass.**  Plaintiff brings this claim individually and on behalf of the Nationwide Class and California Subclass (the Class) who purchased the Products within the applicable statute of limitations.

96.    **CLRA Standard.**  The CLRA provides that "unfair methods of competition and unfair or deceptive acts or practices undertaken by any person in a transaction intended to result or which results in the sale or lease of goods or services to any consumer are unlawful."

97.    **Goods/Services.**  The Products are "goods," as defined by the CLRA in California Civil Code §1761(a).

98.    **Defendant.**  Defendant is a "person," as defined by the CLRA in California Civil Code §1761(c).

99.    **Consumers.**  Plaintiff and members of the Class are "consumers," as defined by the CLRA in California Civil Code §1761(d).

100.    **Transactions.**  The purchase of the Products by Plaintiff and members of the Class are "transactions" as defined by the CLRA under California Civil Code section 1761(e).

101.    **Violations of the CLRA.**  Defendant violated the following sections of the CLRA by selling the Products to Plaintiff and the Class through the false, misleading, deceptive, and fraudulent Toxicity Representations:

a.    Section 1770(a)(5) by representing that the Products have "characteristics, . . . uses [or] benefits . . . which [they] do not have."

b.    Section 1770(a)(7) by representing that the Products "are of a particular standard, quality, or grade . . . [when] they are of another."

c.    Section 1770(a)(9) by advertising the Products "with [the] intent not to sell them as advertised."

102.    **Knowledge.**  Defendant's uniform and material representations and omissions regarding the Products were likely to deceive, and Defendant knew or should have known that its representations and omissions were untrue and misleading.

103.    **Malicious.**  Defendant's conduct is malicious, fraudulent, and wanton in that Defendant intentionally misled and withheld material information from consumers, including Plaintiff, to increase the sale of the Products.

104.    **Plaintiff Could Not Have Avoided Injury.**  Plaintiff and members of the Class could not have reasonably avoided such injury.  Plaintiff and members of the Class were unaware of the existence of the facts that Defendant suppressed and failed to disclose, and Plaintiff and members of the Class would not have purchased the Products and/or would have purchased them on different terms had they known the truth.

105.    **Causation/Reliance/Materiality.**  Plaintiff and the Class suffered harm as a result of Defendant's violations of the CLRA because they relied on the Toxicity Representations in deciding to purchase the Products.  The Toxicity Representations were a substantial factor.  The Toxicity Representations were material because a reasonable consumer would consider them important in deciding whether to purchase the Products.

106.    **Injunction.**  Given that Defendant's conduct violated California Civil Code section 1780, Plaintiff and Class Members are entitled to seek, and do hereby seek, injunctive relief to put an end to Defendant's violations of the CLRA.  Plaintiff has no adequate remedy at law.  Without equitable relief, Defendant's unfair and deceptive practices will continue to harm Plaintiff and the Class.  Under California Civil Code § 1780(a), Plaintiff and Class Members seek injunctive and equitable relief for Defendant's violations of the CLRA.  On March 21, 2023, Plaintiff mailed an appropriate demand letter consistent with California Civil Code § 1782(a).  If Defendant fails to take corrective action within 30 days of receipt of the demand letter, Plaintiff will amend her complaint to include a request for damages as permitted by Civil Code § 1782(d).

<u>COUNT FOUR</u>
**Breach of Express Warranty**
***(On Behalf of the Nationwide Class and California Subclass)***

107.    **Incorporation by Reference.**  Plaintiff re-alleges and incorporates by reference all allegations contained in this complaint, as though fully set forth herein.

108. **Nationwide Class & California Subclass.** Plaintiff brings this claim individually and on behalf of the Nationwide Class and California Subclass (the Class) who purchased the Products within the applicable statute of limitations.

109. **Defendant Issued an Express Warranty.** As the designer, manufacturer, marketer, distributor, and/or seller of the Products, Defendant issued an express warranty by representing to consumers at the point of purchase that the Products were non-toxic. Defendant's representations were part of the description of the goods and the bargain upon which the goods were offered for sale and purchased by Plaintiff and Members of the Class and Subclass.

110. **The Products Do Not Conform to The Toxicity Representations.** In fact, the Products do not conform to Defendant's "non-toxic" representations because the Products are not, in fact non-toxic. By falsely representing the Products in this way, Defendant breached express warranties.

111. **Causation/Remedies.** As a direct and proximate result of Defendant's breach, Plaintiff and Members of the Class and Subclass were injured because they: (1) paid money for Products that were not what Defendant represented; (2) were deprived of the benefit of the bargain because the Products they purchased were different than Defendant advertised; and (3) were deprived of the benefit of the bargain because the Products they purchased had less value than Defendant represented. Had Defendant not breached the express warranty by making the false representations alleged herein, Plaintiff and Class and Subclass Members would not have purchased the Products or would not have paid as much money as they did for them.

### COUNT FIVE
### Breach of Implied Warranty
### (*On Behalf of the Nationwide Class and California Subclass*)

112. **Incorporation by Reference.** Plaintiff re-alleges and incorporates by reference all allegations contained in this complaint, as though fully set forth herein.

113. **Nationwide Class & California Subclass.** Plaintiff brings this claim individually and on behalf of the Nationwide Class and California Subclass (the Class) who purchased the Products within the applicable statute of limitations.

114.     **Defendant is a Merchant.**  Defendant routinely engages in the manufacture, distribution, and/or sale of the Products and is a merchant that deals in such goods or otherwise holds themselves out as having knowledge or skill particular to the practices and goods involved.

115.     **Plaintiff and Class Members Are Consumers.**  Plaintiff and Members of the Class and Subclass were consumers who purchased Defendant's Products for the ordinary purpose of such products.

116.     **Defendant Issued an Implied Warranty.**  By representing that the Products would be non-toxic, Defendant impliedly warranted to consumers that the Products were merchantable, such that they were of the same average grade, quality, and value as similar goods sold under similar circumstances.

117.     **The Products Were Not Merchantable.**  However, the Products were not of the same average grade, quality, and value as similar goods sold under similar circumstances.  Thus, they were not merchantable and, as such, would not pass without objection in the trade or industry under the contract description.

118.     **Causation/Remedies.**  As a direct and proximate result of Defendant's breach, Plaintiff and Members of the Class and Subclass were injured because they paid money for Products that would not pass without objection in the trade or industry under the contract description.

**COUNT SIX**
**Unjust Enrichment/Restitution**
***(On Behalf of the Nationwide Class and California Subclass)***

119.     **Incorporation by Reference.**  Plaintiff re-alleges and incorporates by reference all allegations contained in this complaint, as though fully set forth herein.

120.     **Nationwide Class & California Subclass.**  Plaintiff brings this claim individually and on behalf of the Nationwide Class and California Subclass (the Class) who purchased the Products within the applicable statute of limitations.

121.     **Plaintiff/Class Conferred a Benefit.**  By purchasing the Products, Plaintiff and members of the Class conferred a benefit on Defendant in the form of the purchase price of the Products.

122.     **Defendant's Knowledge of Conferred Benefit.**  Defendant had knowledge of such benefit and Defendant appreciated the benefit because, were consumers not to purchase the Products, Defendant would not generate revenue from the sales of the Products.

123.     **Defendant's Unjust Receipt Through Deception.**  Defendant's knowing acceptance and retention of the benefit is inequitable and unjust because the benefit was obtained by Defendant's fraudulent, misleading, and deceptive representations and omissions.

124.     **Plaintiff and Class Members Lack an Adequate Remedy at Law.**  Plaintiff and members of the putative class have been injured as a direct and proximate result of Defendant's inequitable conduct.  Plaintiff and Class Members lack an adequate remedy at law with respect to this claim and are entitled to non-restitutionary disgorgement of the financial profits that Defendant obtained as a result of its unjust conduct.

125.     **Causation/Damages.**  As a direct and proximate result of Defendant's unjust enrichment, Plaintiff and members of the Class were harmed in the amount of the purchase price they paid for the Products.  Further, Plaintiff and members of the Class have suffered and continue to suffer economic losses and other damages including, but not limited to, the amounts paid for the Products, and any interest that would have accrued on those monies, in an amount to be proven at trial.  Accordingly, Plaintiff seeks a monetary award for unjust enrichment in damages, restitution, and/or disgorgement of ill-gotten gains to compensate Plaintiff and the Class for said monies, as well as injunctive relief to enjoin Defendant's misconduct to prevent ongoing and future harm that will result.

## PRAYER FOR RELIEF

126.     WHEREFORE, Plaintiff, individually and on behalf of all others similarly situated, prays for judgment against Defendant as follows:

a.      **Certification:** For an order certifying this action as a class action, appointing Plaintiff as the Class Representative, and appointing Plaintiff's Counsel as Class Counsel;

b.   **Declaratory Relief:** For an order declaring that Defendant's conduct violates the statutes and laws referenced herein;

c.   **Injunction:** For an order requiring Defendant to immediately cease and desist from selling the unlawful Products in violation of law; enjoining Defendant from continuing to market, advertise, distribute, and sell the Products in the unlawful manner described herein; requiring Defendant to engage in an affirmative advertising campaign to dispel the public misperception of the Products resulting from Defendant's unlawful conduct; and requiring all further and just corrective action, consistent with permissible law and pursuant to only those causes of action so permitted;

d.   **Damages/Restitution/Disgorgement:** For an order awarding monetary compensation in the form of damages, restitution, and/or disgorgement to Plaintiff and the Class, consistent with permissible law and pursuant to only those causes of action so permitted;

e.   **Punitive Damages/Penalties:** For an order awarding punitive damages, statutory penalties, and/or monetary fines, consistent with permissible law and pursuant to only those causes of action so permitted;

f.   **Attorneys' Fees & Costs:** For an order awarding attorneys' fees and costs, consistent with permissible law and pursuant to only those causes of action so permitted;

g.   **Pre/Post-Judgment Interest:** For an order awarding pre-judgment and post-judgment interest, consistent with permissible law and pursuant to only those causes of action so permitted; and

h.   **All Just & Proper Relief:** For such other and further relief as the Court deems just and proper.

## <u>JURY TRIAL DEMANDED</u>

Plaintiff demands a trial by jury on all claims so triable.

Dated:  March 24, 2023                **BURSOR & FISHER, P.A.**

By:   _/s/ L. Timothy Fisher_
            L. Timothy Fisher

L. Timothy Fisher (State Bar No. 191626)
Jenna L. Gavenman (State Bar No. 348510)
1990 North California Blvd., Suite 940
Walnut Creek, CA 94596
Telephone: (925) 300-4455
Facsimile:  (925) 407-2700
E-mail: ltfisher@bursor.com
            jgavenman@bursor.com

*Attorneys for Plaintiff*

1

**CLRA Venue Declaration Pursuant to California Civil Code Section 1780(d)**

2

I, L. Timothy Fisher, declare as follows:

3

1.    I am an attorney at law licensed to practice in the State of California and a member

4

of the bar of this Court.  I am a Partner at Bursor & Fisher, P.A., counsel of record for Plaintiff

5

Christina Noori in this action.  Plaintiff Noori alleges she is a citizen of San Leandro, California,

6

Alameda County.  I have personal knowledge of the facts set forth in this declaration and, if called

7

as a witness, I could and would competently testify thereto under oath.

8

2.    The Complaint filed in this action is filed in the proper place for trial under Civil

9

Code Section 1780(d) in that a substantial portion of the events alleged in the Complaint occurred

10

in this District.

11

I declare under the penalty of perjury under the laws of the State of California and the

12

United States that the foregoing is true and correct and that this declaration was executed at Walnut

13

Creek, California, this 24th day of March, 2023.

14

15

          */s/ L. Timothy Fisher*
                L. Timothy Fisher

16

17

18

19

20

21

22

23

24

25

26

27

28